### PINSON v. KANSAS CITY SOUTHERN RY. CO.

Circuit Court of Appeals, Fifth Circuit. February 3, 1930.

Rehearing Denied March 7, 1930.

No. 5570.

Foster, Circuit Judge, dissenting.

Wright Patman, of Texarkana, Tex., and George T. Bartlett, of Linden, Tex. (G. T. Bartlett, of Linden, Tex., Wright Patman, of Texarkana, Tex., C. R. Newland, of Linden, Tex., and D. D. Newman, of Leesville, La., on the brief), for appellant.

J. Q. Mahaffey, of Texarkana, Tex. (J. Q. Mahaffey, of Texarkana, Tex., F. H. Moore, of Kansas City, Mo., and John J.

King, J. I. Wheeler, and C. E. Bryson, all of Texarkana, Tex., on the brief), for appellee.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge. The issues of this case are fully stated in the opinion on the previous appeal of the defendant, and will not be repeated here. 23 F.(2d) 247. A verdict for the plaintiff was therein set aside, for the reason that the evidence was found insufficient to show negligence on the part of the railroad company. On the second trial, after the plaintiff had completed her proof, and before defendant had offered any evidence, on motion of the latter, the lower court directed a verdict in its favor. The sole question before us at this time, therefore, is as to whether there was evidence tending to show negligence on the part of defendant sufficient to require a submission of the case to the jury.

It is first contended that the record does not show that the dog referred to in the testimony of the various witnesses on the second trial as "Rock" was the one which bit the plaintiff. However, the answer does not deny that plaintiff was bitten at the time alleged, for in the third paragraph thereof it "says that the plaintiff, Della May Pinson, by her own acts, caused the dog *in question* to bite her at the time alleged, and for this reason, among other things, the plaintiff is not entitled to recover herein. * * *" The answer otherwise is a denial that she fell against or was injured by the ledge of the window, after being bitten by the dog, and defendant avers that this suit is a fraudulent conspiracy to obtain money from it on the part of the plaintiff by pretending to have been injured. Both on the original and second trials there was no dispute apparently as to the fact that the dog bit her, but the fact that she was seriously injured was, of course, denied as well as that the defendant was guilty of negligence.

All of the testimony tended to show that there was but one dog in question, and that was the one which bit her. He was uniformly referred to on the first trial as "Rock," and there does not appear to have been any issue raised about this below. It is also clearly shown by the judge's charge, in directing a verdict, wherein he states that, in spite of his own views to the contrary, he is bound to follow the ruling of this court that the defendant company was required to use only ordinary care, and under that theory in his opinion the evidence was not sufficient to sustain

a verdict for plaintiff. Then, too, this record was by agreement curtailed, so as to present only the issue as to whether or not the defendant had been shown to be negligent in permitting the dog, in the manner disclosed by the evidence, to be in its depot at the time plaintiff was bitten, and the parties appear to have had no thought about the point now raised in this court that Rock was not the dog involved. The stipulation concurred in by counsel on both sides, and approved by the court below, was "that the issues * * * can be decided * * * without an examination of all the pleadings and evidence filed and taken herein on the trial of this case. * * *" Hence we will assume that the court below had before it sufficient evidence otherwise to permit it to decide the issues which were decided and are now before us on this appeal, and will not entertain the contention of the defendant upon the point raised.

There was considerable cross-examination of plaintiff's witnesses below as to the color and appearance of the dog Rock, but this was manifestly for the purpose, first, of determining whether they knew or were familiar with the dog in question or the one in the depot at the time plaintiff was bitten and on other occasions; and, secondly, to test their credibility.

The evidence brought up on this appeal consists, first, of the testimony of the plaintiff and her mother as to the time, place, and circumstances under which she was bitten, her fall against the window ledge, the attendance of the doctor, etc., her father's statement as to what he had expended in medical treatment of the plaintiff, etc., and the testimony of some seven other witnesses as to the nature and reputation of Rock for viciousness, and the frequency with which he was seen in and around the depot of the defendant.

The first of these latter witnesses was J. T. Scoggins, who stated he knew the dog Rock, and on several occasions prior to December 9, 1923, had seen him, together with other dogs, with a special agent of the defendant company by the name of Ball, around the depot of the defendant, but witness had no knowledge as to what Ball used the dog for or if he used him for anything; did not know whether Ball ever made any effort to keep him around the depot; that witness never saw Rock in the depot, and did not know whether he was vicious or not.

The next witness was a man by the name of R. E. Kay, who operated a service car at Leesville before and at the time plaintiff was

bitten, and had occasion to visit the depot on the arrival and departure of trains many times a day. He knew Rock, and had seen him and other dogs around the depot frequently with Mr. Ball, special agent for the railroad company; that he had not seen Rock around the depot since the plaintiff was bitten; that there were two dogs that stayed around the depot with Mr. Ball, but he did not know which one was named Rock, one being speckled or spotted and the other red or black and tan. Witness was not at the depot when plaintiff was bitten, but returned there shortly afterwards, and saw her in the waiting room with her leg bandaged and bleeding just above the ankle. He never saw a dog in the depot or waiting room more than one time. He had seen a red hound around the depot a number of times, but did not remember ever seeing him in the depot.

Next appears the testimony of the witness Perry McElveen. He knew a dog named "Rock" at Leesville which was "a big red hound dog." He had seen him around town for several years before the injury to plaintiff. This dog had a "highly nervous disposition, and if you walked up to him he would bite if he was asleep, or if you stepped on him accidently or on purpose * * * he was vicious—a dreaded dog. That was what people generally said about him." He had seen this dog around the station at Leesville with Mr. Ball, special agent for the Kansas City Southern Railway Company, who "used dogs in the performance of his duties and this was one of them. He had a big spotted dog that I would see around there. I have seen this dog inside the station in the office. They were not paying any attention to him that I know of. He just went and came. I would not think it was an unusual thing to see him around the office. I really don't know how long he hung around that office before this girl was bitten. Well, it was months. Mr. Ball was very friendly with the dog. I saw him there with Mr. Ball a number of times." Witness, together with the night marshal of the town and Ball, chased a negro who had committed some offense with this dog and another. "I saw this dog in the office times when I would be there. I don't recall any dates on that. I do not remember him being in the office more than once. * * * It was the general talk that Rock was a vicious dog."

On cross-examination, he was asked if he had not testified previously that, while the dog roamed the town, "as to his being of a friendly disposition, I know nothing about that," and replied that he did not know anything of his being of a friendly disposition; further, if he had not also stated in his previous testimony that "I have never heard of him biting anyone unless he was molested in some way, either by accident or on purpose," and replied, "I imagine I did." This was what he based his statement that Rock was a vicious dog upon. He could not recall but one time that he saw him in the depot, and did not recall of having seen him in the waiting room.

Y. I. Dowden was a man 70 years of age when giving his testimony in the spring of 1929, and therefore about 65 when the plaintiff was bitten in 1923. He worked in the water service department, and therefore had occasion to go to the depot every day to send off his reports. He frequently saw an old dog around the station that they called Rock. The first occasion was about the time when Ball was first appointed special agent. He noticed the dog "in and around, going in and out. The dog would be around the depot sometimes under the porch, you might call it. I would see the dog in and around that depot; I would see him in the waiting room, and once I saw him going out with another spotted dog, out the door and towards the street with Mr. Moore. Mr. Moore was one of those men that work for the car knockers, as well as I know. He might have worked at the roundhouse, but his business was in the yard. * * * I could not tell you the number of times I had seen that dog in the waiting room; I saw him there perhaps half a dozen times or more in the waiting room and he would come out of there; perhaps I would meet him and he would be going to the baggage room. * * * When I would see this dog in the waiting room I would generally see him lying around that stove or up in the corner somewhere—anywhere he felt like it. He seemed to be at home and I did not molest him."

"I was going into the waiting room from the street, and Mr. Moore was coming out with the dog, and he passed out and I passed in before the dog got out, and the dog growled, and Mr. Moore turned back abruptly and said to me, 'Don't you kick my dog.' I said, 'I haven't kicked your dog, but if necessary I will.' "

"In addition to seeing Rock a number of times in the waiting room when it was cold, I often seen him go around, go out the front door and go this walkway, perhaps going toward the round house. I don't know where he was going."

"The reputation of the dog was, they could trail people with him, and he would bite you

if you bothered him, even on the streets or anywhere else, if you bothered him. He had that reputation."

William McInnis testified that he was a carpenter, and had lived in Leesville about 20 years; that he knew a black dog with a tan breast, black sides, and tan legs called "Rock," and he would "take him to be very much blood-hound"; that he frequently had occasion to be around the depot prior to the time he heard plaintiff had been bitten and had seen the dog "in the depot or around the depot. The first time I seen him he was in the freight room. * * * We got out the freight that was at one side, and we had some more freight on the right hand side of the freight door as you go in, and Rock was over by that freight, and he rose up and started to growl, and what I knew of the dog I let him alone, and I turned back and a car knocker came there and persuaded him out, and I got the balance of the freight. He was a vicious dog; he wouldn't be tampered with at all. I saw him in the waiting room twice. The first time I seen him was somewhere after July 4th. We had some heavy freight to get out of there, and we always had to send some man to get it out, help the man with the team to get it out and get it up, and it was some time after July 4th; it might have been July 12th, or after that. As to the occasion of me going into the depot waiting room, the first time my girl was going off on the train; she was going off to school; that was the first time. I didn't see the dog until she set down the suitcase and bumped him, and that is when he rose up and growled, and I shoved my suitcase in between the girl and the dog. He was lying to the right of the door as you go into the waiting room, and she just set her suitcase down, being in a hurry, and bumped him with it, and Rock rose up. We didn't have any further trouble with him then; we got our tickets and got on out, and we didn't have any more trouble with him at that time at all. A man driving a service car down there got him out of there. I don't know just how he got him out, but I take it they petted him out; they didn't drive him out. They got him out, and I got the girl on the train."

"I saw him once more after that. I went up to the right hand side of the ticket window. A man was standing on the left, and Rock was laying down to the right of the window, behind me, and I didn't know he was there, and when I stepped back on Rock he grabbed me, right along there on the right leg. I was standing right where this lady is standing (looking at picture exhibited to him), and I stepped back this way, and he grabbed me on the right leg. The dog was laying back near that stove, against the wall. I made complaint about it, like any other ordinary, half-scared man would do, you know. The ticket window opened, and I told that fellow, I said, 'You ought to get that kind of animal out of here, a dog that would bite people.'

"Mr. Mahaffey: Who did you say that to? A. The ticket agent, the man that sold me the ticket. And he told me, he says, 'Well, we have got to keep him there. The special agent is using him at any time, you see.' "

Another witness, G. C. Cook, who was an employee of a lumber company at Leesville, in 1923, testified to having seen the dog called "Rock" around and in the depot or waiting room several times with Mr. Ball, the special agent. He also saw him lying around the stove and next to the bench, usually on cold, wet days. He further testified as follows:

"I have seen Mr. Ball carrying the dog out; that is, I seen the dog following him. He was out leading the dogs, had them running ahead of him. He was training the dogs. He had two of them, Rock and another one."

" * * * No sir, when I saw that dog in the waiting room I never did see the agent of the company in a position to observe him there. Well, they were going back and forth with their work, and they didn't bother the dog."

Witness further stated that he had seen other dogs around there, but never saw any of them in the waiting room.

The last witness, J. C. Leach, testified that he operated a truck or transfer line in Leesville in 1923, and heard of the injury to plaintiff about the time it happened. He knew Rock, and described him about like the other witnesses, with only the variance which would appear natural under the circumstances, where all of them were testifying several years after the occurrence of the facts. He had seen the dog at the depot for several months, "off and on," before the plaintiff was bitten. We further quote from his testimony as follows:

"I have seen the dog in the freight house, in the office and in the waiting room. I was unloading cars on the platform, and as a general rule, why, he was around the station. I have seen him in the ticket office, and I have seen him laying by the stove in the waiting room several times. I certainly do identify that as a picture of the waiting room in the station at Leesville. When the dog was in the waiting room, usually it was bad weather, rainy weather, or cold weather. He would lie between the window and this stove, generally

next to the wall. We have a door here, opened into the ticket office. He was always between the window and the door going into the office. I saw him in the ticket office many times. Lots of times he was chained, and other times he was footloose; I have seen him both ways. At the times I would see this dog, I saw the agents go through the waiting room where they could see him. I was personally acquainted with all of them, and I had seen them go through there. The dog was taken quite good care of, and he was used sometimes as a bloodhound to run down men. I have seen him in training, and in actual service. Mr. Ball had charge of the dog at the time. He was a special agent of the company. I have seen the dog petted, in the station, and on one occasion I saw the operator, after he completed his lunch he had a piece of sandwich there, just a small piece, and Mr. Ball picked it up and fed it to the dog. The operator's name was Cantey, Robert Cantey. The dog was in the office. I had seen him in the office a lot of times. My business called me to the station practically seven days a week; there would be some weeks I would not be there each and every day, but practically every day I would be there, and nearly every day the dog would be around, unless he was on a trip. He would be in one of those places—that is, the freight department or the office or the ticket office. That was his general hang-out; all the railroad men knew him, and all of them sanctioned him along."

"From the service that they used this dog for, he must have been reasonably bad. I would think he would be considered a vicious dog. I heard people talk that way. By a few—that is, the ones that knew the dog—he was regarded as a vicious dog."

■■ If the case had gone to the jury, and it had believed this testimony, we think there was ample proof to show that the ticket agent or such other employee as was charged with the duty of policing the waiting room was bound to know, or by the exercise of reasonable care should have known, not only that the dog in question was frequenting the place where passengers were required to be in dealing with the company, but that another employee of the company was constantly bringing the dog into and around those premises.

It does not seem reasonable to say that so many other persons whose business required them to go to the depot could have seen and known these facts for so long a time before the injury to plaintiff without the agent, who was there daily, having done so. Besides, one or more of the witnesses testified that the fact that Rock had snapped at or bitten others had been brought to the attention of the agent before the circumstance complained of by plaintiff, and was met with the statement that it was necessary for him to be there for the use of Mr. Ball, the special agent. As heretofore stated, if this testimony was believed by the jury, it would certainly bring home to the company knowledge both of the presence of the animal and of his dangerous nature. Further, taking the evidence as a whole, they might have concluded that the special agent, whose duty it was to guard the company's property, was, because of the character of this dog, making use of him for the defendant's benefit, and for such a length of time and under such circumstances as to amount to authorization or approval, if it had not expressly done so.

■ If the dog was being kept or allowed to be about the station for defendant's benefit, or if with knowledge of the fact that he was frequenting the waiting room where passengers were required to be in their dealings with the defendant, and it knew, or under the circumstances should have known, of his disposition to bite, if touched or disturbed, it did nothing to correct the condition, then it was guilty of negligence rendering it liable to passengers who might be injured thereby without fault of their own. The relation of passenger and carrier did not end with leaving of the train by plaintiff, but continued until she had a reasonable opportunity to see about her baggage and to find some means of getting to her destination after arriving at the hour of 3:30 o'clock in the morning. 4 R. C. L. 1045, Carriers, § 497.

With this further proof having been submitted on the second trial, we think the case should have gone to the jury, and for this reason the judgment is reversed, and the case remanded, to be proceeded with according to law.

FOSTER, Circuit Judge, dissents.